**Opinion filed December 30, 2021**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00258-CV

_____

## KINDER MORGAN PRODUCTION COMPANY, LLC, Appellant

## V.

## SCURRY COUNTY APPRAISAL DISTRICT, Appellee

**On Appeal from the 132nd District Court**
**Scurry County, Texas**
**Trial Court Cause No. 26723**

## O P I N I O N

This appeal concerns yet another chapter in the ongoing feud between these parties. Here, the underlying dispute arises from an ad valorem tax suit filed by Kinder Morgan Production Company, LLC (KMPC) in which it appealed the order of the Scurry County Appraisal Review Board (the ARB) and challenged the appraised value of certain mineral interests in Scurry County for the 2019 tax year.

The case proceeded to trial rather expeditiously. After KMPC rested its case, the trial court granted a directed verdict in favor of the Scurry County Appraisal District (the Appraisal District) and rendered judgment that KMPC take nothing.

In three issues, KMPC asserts that the trial court abused its discretion when it (1) permitted the Appraisal District's experts to revise or supplement their opinions multiple times, including once less than thirty days before trial commenced, but denied KMPC's only request to allow its experts to supplement their opinions; (2) excluded the testimony of KMPC's experts but allowed the testimony of the Appraisal District's experts when the objections to both parties' experts involved the proper application of Section 23.175 of the Texas Tax Code; and (3) overruled KMPC's motions and requests to continue the trial when KMPC's retained lead counsel was ordered by his personal physician not to appear for trial in person during the COVID-19 pandemic and, after lead counsel appeared and attempted to participate remotely, technical difficulties prevented him from fully and effectively representing KMPC. For the reasons stated below, we reverse the trial court's judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

I. *Factual and Procedural Background*

Significant production of oil from the Canyon Reef formation in Scurry County began in 1948. The field was large, covering approximately 56,000 acres, and had an estimated 2.8 billion barrels of original oil in place. All of this oil cannot be recovered with either the extraction techniques that were available and utilized at the time that the field was discovered or that are available and utilized today.

Oil in this formation was initially produced from individual leases through primary production, in which pressure from the formation was sufficient, with or without the aid of a pump jack, to force the oil out of the ground. As oil was produced, the pressure in the formation decreased and the production rate declined.

2

Only about 20% of the original oil in place was recoverable through primary production.

After primary production had "run its course," an additional 20% of the original oil in place could be recovered through secondary recovery, which involved the injection of water into the formation through an injection well in order to increase the pressure and force the oil to the surface in a producing well. With this recovery method, some of the injected water returns to the surface with the oil and gas. However, because it was not possible to control the subsurface flow of the injected water, the water could return in a well that was located on a different lease than the lease on which the injection well was located. Because secondary recovery was not viable on the individual leases in the Canyon Reef formation, the leaseholders unitized the field and, in 1953, began to operate as the Scurry Area Canyon Reef Operators Committee (the SACROC). Secondary recovery through waterflooding began in the SACROC in 1954.

Tertiary recovery, which involved a carbon dioxide or $CO_2$ flood, started in 1971 after the secondary recovery method began to lose its effectiveness. Generally, an additional 10% to 20% of the original oil in place can be recovered through tertiary recovery, which is the final method of recovery that is available when utilizing current technology. In 1973 or 1974, the SACROC reached its peak production of approximately 215,000 barrels of oil per day. However, by the late 1990s, the field was producing less than 10,000 barrels of oil per day.

In Texas, the typical "working interest" in oil and gas production is 7/8th of the net revenue and the typical "royalty interest" is 1/8th of revenue. The working interest bears all the production costs. In 2000, KMPC purchased approximately 97% of the working interest in the SACROC. KMPC also owns royalty and overriding royalty interests in the SACROC. Through significant investment, KMPC expanded the $CO_2$ flood into other areas of the SACROC and continued

3

tertiary recovery in the field through alternating water and gas floods. KMPC developed the SACROC sequentially in defined geographical areas of the field, referred to by KMPC as "projects." Due to the continued investment by KMPC, since 2006 the SACROC has produced approximately 30,000 barrels of oil per day.

For the 2019 tax year, the Appraisal District valued the working interest in the SACROC at $701,351,622. KMPC protested the valuation to the ARB. *See* TEX. TAX CODE ANN. § 41.41 (West Supp. 2021). The ARB denied the protest and determined that the appraisal records were correct and should not be changed.[1] On September 20, 2019, KMPC appealed the ARB's order and determination to the trial court. *See id.* § 42.01. KMPC alleged in its petition that the value found by the ARB exceeded both the appraised value required by law and the median appraised value of comparable properties; that the owner's name and the property description were incorrect; and that levying a tax based on the incorrect valuation was excessive, unequal, and would cause injury to KMPC.

The Appraisal District answered and filed a motion to consolidate this case with other litigation that was pending between various Scurry County taxing entities and KMPC. During a December 2, 2019 hearing, the trial court granted the Appraisal District's motion, in part, and consolidated the cases for purposes of discovery. On January 10, 2020, the trial court orally issued a June 22, 2020 trial setting for this case; it also signed an order granting the motion to consolidate. On January 14, 2020, the trial court signed a scheduling order in which it ordered and required (1) KMPC to designate its primary expert witnesses by March 15, 2020, (2) the Appraisal District to designate its primary witnesses on "market value" by

---

[1]The Appraisal District asserted that it had a long-standing agreement with KMPC to value the entire working interest and then apportion that value to individual accounts. Because KMPC did not own the entire working interest and also owned overriding royalty and royalty interests, the value found by the ARB was not the appraised value of KMPC's oil and gas interests in Scurry County.

March 15, 2020, (3) the parties to designate their rebuttal expert witnesses by April 15, 2020, and (4) the parties to complete discovery by April 22, 2020.

KMPC sought mandamus relief from the trial court's consolidation order. *See In re Kinder Morgan Prod. Co., LLC*, No. 11-20-00027-CV, 2020 WL 1467281, at *1 (Tex. App.—Eastland Mar. 26, 2020, orig. proceeding) (mem. op.). We stayed discovery in the other related litigation and allowed discovery to proceed in this case. On March 26, 2020, we conditionally granted KMPC's petition for writ of mandamus and directed the trial court to vacate the consolidation order, *id.* at *5, which it later did on March 31, 2020.

The trial court subsequently modified its scheduling order and extended the discovery deadline to May 22, 2020 and granted KMPC's motion to continue the June 22, 2020 trial date; however, voir dire was reset for August 20, 2020, with the trial on the merits to commence on August 24, 2020. On July 10, 2020, the trial court orally granted the Appraisal District's motion to exclude KMPC's primary and rebuttal expert witnesses. Four days later, the trial court signed orders memorializing those rulings.

In response to the trial court's witness-exclusion rulings, KMPC's primary experts prepared a supplemental report, and KMPC filed a motion for leave to file the supplemental report. Because the trial court did not set a hearing on KMPC's motion for leave, KMPC requested that the motion be considered by submission. Nevertheless, the trial court did not rule on KMPC's motion for leave to file the supplemental report.

KMPC moved to continue the August 2020 trial setting on the ground that it had a due process right to be represented by counsel of its choice and that, pursuant to his personal physician's instructions, KMPC's lead counsel could not appear in person during the COVID-19 pandemic. Although the trial court denied the motion for continuance, it allowed KMPC's lead counsel to appear and participate at trial

5

by remote means. After numerous technical difficulties with both Zoom and the audio system arose during trial, KMPC orally re-urged its motion for continuance, and KMPC's lead counsel objected to being restricted and required to participate in the trial under circumstances that prevented him from being able to fully and effectively represent KMPC. The trial court denied KMPC's re-urged continuance request and overruled lead counsel's objection.

At trial, the Appraisal District objected to the presentation of any testimony by KMPC's primary experts based on the trial court's "prior rulings." The trial court sustained the Appraisal District's objections on the ground that it had ruled at the pretrial hearings that the opinions to be offered by KMPC's designated experts were based on an "incorrect application of the law." After KMPC rested its case, the trial court granted the Appraisal District's motion for directed verdict, and rendered judgment that KMPC take nothing. This appeal followed.

## II. *Standard of Review*

We review KMPC's complaints about the trial court's exclusion of KMPC's experts and denial of KMPC's motion for continuance under an abuse-of-discretion standard. *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012) (holding that a trial court has broad discretion in determining whether expert testimony is admissible); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) (holding that a trial court's denial of a motion for continuance is reviewed for an abuse of discretion). In our review, we do not substitute our judgment for that of the trial court. *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (per curiam). Rather, we must determine whether the trial court reached a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Joe*, 145 S.W.3d at 161. The test is whether the trial court acted without reference to applicable guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

III. *Expert Reports*

In its first two issues, KMPC complains that the trial court abused its discretion when it (1) permitted the Appraisal District's designated experts to revise or supplement their reports multiple times, including once less than thirty days before the commencement of trial, but denied KMPC's only request to allow its designated experts to do the same and (2) excluded the testimony of KMPC's experts but permitted the Appraisal District's experts' testimony because the objections that were asserted to all of the parties' designated experts involved the proper application of Section 23.175 of the Tax Code.

A. *Applicable Law*

In Texas, it is constitutionally required that taxation be "equal and uniform." TEX. CONST. art. VIII, § 1(a). "[A] property tax is equal and uniform 'only if it is in proportion to property value.'" *EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 576 (Tex. 2018) (quoting *In re Nestle USA, Inc.*, 387 S.W.3d 610, 620 (Tex. 2012) (orig. proceeding); *see also* TEX. CONST. art. VIII, § 1(b) (stating that, unless exempt, all real property and tangible personal property in Texas "shall be taxed in proportion to its value, which shall be ascertained as may be provided by law").

Generally, all taxable property "is appraised at its market value as of January 1" of each tax year. *Id.* § 23.01(a) (West 2021). "Market value" is the price at which property would transfer for cash or its equivalent value under prevailing market conditions if (1) the property was exposed for sale in the open market with a reasonable time for the seller to find a purchaser, (2) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on the use of the property, and (3) neither the seller nor the purchaser is in a position to take advantage of the exigencies of the other and both seek to maximize their gains. *Id.* § 1.04(7) (West

7

Supp. 2021). Market value must "be determined by the application of generally accepted appraisal methods and techniques." *Id.* § 23.01(b). The three accepted approaches to determining market value are (1) the market data comparison method, (2) the income method, and (3) the cost method. *EXLP Leasing*, 554 S.W.3d at 577 (citing TAX §§ 23.011, .012, .013).

However, "while many of the tax code's valuation methodologies are based on market value, the code also provides for alternative valuation methods in some circumstances." *Id.* Subchapter B of Chapter 23 of the Tax Code provides for such special appraisal provisions. TAX §§ 23.11–.26. As relevant here, Section 23.175, which is titled "Oil or Gas Interest," sets out a formula that is to be used to project the future price of oil or gas when an oil or gas interest is valued using the income method.[2] *Id.* §§ 23.012(a)(4); .175(a); *In re ExxonMobil Corp.*, 153 S.W.3d 605, 616 n.22 (Tex. App.—Amarillo 2004, orig. proceeding [mand. denied]). Section 23.175 also requires that the Texas Comptroller develop a manual that specifies "the formula to be used in computing the limit on the price" used in the second through the sixth year of the appraisal and "the methods and procedures to discount future income from the sale of oil or gas from the interest to the present value." *Id.* § 23.175(b). Each appraisal district is required to "use the formula, methods, and procedures" that are specified in the manual. *Id.* § 23.175(c).

B. *Applicable Facts*

Both KMPC and the Appraisal District designated experts on the issue of valuation. The experts uniformly recognized that production rates in the SACROC would decline in the future and that there would be a point in time at which

---

[2]"The income approach consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value." *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009) (per curiam). Generally, the use of the income approach "is appropriate when property would, in the open market, be priced according to the income that it already generates." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001).

production from the SACROC would no longer be economically viable. In appraising the value of the working interest, all of the experts used and relied on the income method and considered the requirements of Section 23.175. All of the experts recognized that the important factors to consider were the price of oil, the amount of production, the expenses incurred, and the discount rate. However, the experts formulated vastly different conclusions concerning the value of the working interest based, primarily, on conflicting opinions as to the rate of decline in future production, the amount of future investment that KMPC would dedicate to and make in the SACROC, and the categories of oil reserves that could be considered in the appraisal.

Reserves are volumes of hydrocarbons that can be economically produced under certain assumed circumstances. One way that reserves can be classified is based on "technical certainty," meaning how likely it is that the projected amount of reserves is correct given the available technical data. The reserves are classified as proved, probable, and possible. Proved reserves are much more likely than not to be produced, probable reserves are as equally likely than not to be produced, and possible reserves are less likely than not to be produced.

Reserves can also be categorized based on their maturity in terms of development. The lowest level of maturity is a completely undeveloped reserve from which there is no production. The highest level of maturity is a proved developed producing reserve, meaning that there is current production from a given strata.

KMPC designated two primary expert witnesses, Steve Hendrickson and Ron Little, who prepared a joint report. Hendrickson, KMPC's technical expert, opined that production had remained relatively constant in the SACROC because of KPMC's sequential development of each project. According to Hendrickson, production in each project responds rapidly to the CO2 flood and then declines

quickly. Therefore, KMPC will flood each project with CO2 for only a "few years" and then, once it becomes uneconomical to flood a project, direct the CO2 to a different project. In Hendrickson's opinion, it was necessary to analyze each project individually to predict its future performance because attempting to predict the performance of the SACROC "in total" would "overlook the unique behavior" of the projects and "generate an overly optimistic forecast." Because future projects would require significant capital investment by KMPC and might not be completed, Hendrickson considered production from those future projects to be undeveloped reserves.

Based on proved developed production as of January 1, 2019—in other words, on production from wells that had already been drilled or that, as of January 1, 2019, KMPC planned to drill—Hendrickson opined that the SACROC had an economic life of three years. Using and relying on Hendrickson's calculation of the economic life of the SACROC, Little, a real estate appraiser, valued the working interest at $278,400,494 and the royalty interest at $136,201,270.

The Appraisal District designated three primary expert witnesses, Stephen Campbell, Roy Williamson, and Kenneth Hitt, and one rebuttal witness, Paul Hornsby. Although designated as a rebuttal witness, Hornsby not only critiqued the Little/Hendrickson report but offered an independent valuation of the working interest in the SACROC. Hornsby offered this valuation opinion after the deadline ordered by the trial court for designating primary expert witnesses had passed.

The Appraisal District's experts calculated the market value of the working interest based on projected future production that could be obtained if KMPC continued to invest in and develop the SACROC. The Appraisal District's experts, however, disagreed as to the categories of reserves that should be considered and included in the appraisal. For purposes of the appraisal, Williamson and Hitt valued only proved developed producing reserves; Campbell's appraisal included a mix of

10

old developed reserves and new undeveloped reserves; and Hornsby valued proved, probable, and possible reserves. Their opinions of the economic life of the SACROC ranged from nine years (Hornsby); to nineteen years (Hitt); to twenty-five years (Williamson). According to Campbell, he did not really consider the economic life of the SACROC, but rather, projected that production would continue from the SACROC for approximately twenty-five years.

As to the value of the mineral interests, Williamson initially appraised the fair market value of a net 83% interest at $927,600,000. However, on April 22, 2020, more than a month after the ordered designation deadline for primary expert witnesses had expired, Williamson produced a second report in which he changed the operating costs, CO2 costs, and capital costs that he used in determining the appraisal and increased the interest being valued to 100% of the working interest. After Williamson's supplemental report was produced, the opinions of the Appraisal District's experts as to the value of the working interest ranged from $1,259,202,000 (Williamson); to $1,155,865.504 (Hornsby); to $833,130,823 (Hitt); to $701,351,622 (Campbell).

The parties deposed the designated expert witnesses through electronic means in May 2020. After their depositions, both Hornsby and Williamson offered supplemental opinions as to the value of the royalty interest.

Both KMPC and the Appraisal District moved to exclude the other's experts on the basis that the experts had not properly applied the criteria of Section 23.175. KMPC argued that Section 23.175 required that its interests be appraised at something other than market value and that, because it could not be assumed that KMPC would continue to engage in expensive future development, only production from wells existing on the valuation date should be included in the appraisal. KMPC asserted that, instead of following the statutorily-mandated formula, the Appraisal District's experts determined a "market value" for the mineral interests by

11

improperly including in their calculation "revenue from wells that had not yet been drilled, including future, speculative revenue that is not authorized by the legislature."

The Appraisal District, on the other hand, contended that, unless otherwise provided by the Tax Code, all property was required to be appraised for taxation purposes at its market value. According to the Appraisal District, although Section 23.175 dictated how to project the price for future oil and gas sales if the property was being appraised when using an income approach, it did not "otherwise deviate from the market value standard" and did "not limit the appraisal to any type of oil and gas reserves." The Appraisal District argued that "[t]he Little-Hendrickson assumption that Section 23.175 limits an appraisal to 'proved developed producing' reserves is based on an inventive and false reading of 23.175" and that future production based on the development of reserves not currently in production could be considered in determining the market value of the interest.

KMPC filed a motion for partial summary judgment on the ground that the interpretation of Section 23.175 was a "pure question of law" for the trial court to determine. KMPC specifically asserted that the Appraisal District's interpretation of Section 23.175 permitted the Appraisal District "to tax 'behind the pipe,' reaching theoretical revenue from production that [KMPC] might or might not realize, in addition to production from existing wells." KMPC argued that Section 23.175 "does not direct the appraiser to consider theoretical future production—production from wells that might be, but have not been drilled—particularly when realizing income from such production requires significant capital expenditure." KMPC further argued that the Appraisal District's "market value analysis" did not comply with Section 23.175 and requested that the trial court hold the Appraisal District "to the strictures of the Tax Code" and "order that the appraisal reports proffered by

12

Williamson, Campbell, Hornsby, and Hitt constitute[d] 'no evidence' of the appropriate appraised value for the interest at issue."

Between June 7, 2020, and June 23, 2020, the Appraisal District produced a rebuttal report, a rebuttal affidavit, and an affidavit by Hornsby, three affidavits by Williamson, two affidavits by Campbell, and two affidavits by Hitt. KMPC contended that certain statements in these supplemental reports and affidavits either conflicted with the expert's prior testimony or constituted additional opinions by the expert.

On July 10, 2020, the trial court heard the competing motions to exclude and KMPC's motion for partial summary judgment. At the conclusion of the hearing, the trial court first denied KMPC's motion for partial summary judgment. The trial court then stated that it "disagree[d] with [KMPC's] theory of valuation" and "agree[d] with [the Appraisal District's] theory." On July 14, 2020, the trial court signed an order granting the Appraisal District's motion to exclude Little's and Hendrickson's primary testimony and report without stating a basis for its ruling. The trial court also signed an order in which it excluded Little's and Hendrickson's rebuttal testimony "to the extent that their opinions are based on [KMPC's] misinterpretation of Section 23.175 of the Texas Tax Code that the appraisal of the subject property is limited to income from oil and gas produced from wells and recovery efforts in active production as of the valuation date."

On July 21, 2020, the Appraisal District produced a supplemental report from Campbell in which he allocated his value of the working interest and royalty interest as well as the values found by Hitt, Williamson, Hornsby, and Little to KMPC's individual accounts. KMPC moved to strike all of the Appraisal District's supplemental reports and affidavits as untimely; however, the trial court denied KMPC's motion.

13

On August 7, 2020, KMPC filed a supplemental report from Little and Hendrickson to address the trial court's ruling on the construction of Section 23.175. Little and Hendrickson included in their supplemental appraisal proved undeveloped reserves that were projected to be produced from projects that KMPC had planned, but not begun, on January 1, 2019. After including and considering the additional production, Hendrickson opined that the economic life of the SACROC was four years. Based on Hendrickson's opinion, Little opined that the value of the working interest was $280,997,092 and the value of the royalty interest was $142,718,728. KMPC then filed a motion for leave to file the supplemental report. Because KMPC could not obtain a hearing on its motion, it requested that the motion be determined by submission. Nevertheless, the trial court did not rule on KMPC's motion for leave to file the supplemental report. Instead, at trial, the trial court sustained the Appraisal District's objections to Little's and Hendrickson's opinions and testimony on the ground that it had determined pretrial that their opinions were based on an "incorrect application of the law."

C. *Exclusion of Expert Reports*

In its second issue, KMPC asserts that the trial court abused its discretion when it excluded KMPC's experts' opinions because (1) the opinions satisfied the criteria of Rule 702 of the Texas Rules of Evidence and (2) it treated the Appraisal District and KMPC differently when it determined that KMPC's objections to the Appraisal District's experts based on their interpretation of Section 23.175 went to the weight and credibility of their opinions while the Appraisal District's objections to KMPC's experts based on Section 23.175 applied only to the opinion's admissibility.

Under Rule 702 of the Texas Rules of Evidence, a qualified expert may offer opinion testimony if that testimony is both relevant and based on a reliable foundation. *Enbridge Pipelines*, 386 S.W.3d at 262; *E.I. du Pont de Nemours &*

*Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also* TEX. R. EVID. 702. "Appraisal expertise is a form of 'specialized knowledge [used to] assist the trier of fact to . . . determine a fact in issue'" and is subject to the requirements that it be relevant and reliable. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (quoting TEX. R. EVID. 702). Because jurors may place great weight on expert testimony, a trial court has a heightened responsibility to ensure that expert testimony is both relevant and reliable. *Robinson*, 923 S.W.2d at 553–54; *see also Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 204 (Tex. 2021) (noting that the trial court is the gatekeeper of the evidence and that expert testimony is not admissible if it is unreliable or not relevant to an issue the jury must decide).

To be relevant, the expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (quoting *Robinson*, 923 S.W.2d at 556); *see also State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "Evidence that has no relationship to any issue in the case does not satisfy" the requirements of Rule 702. *Zwahr*, 88 S.W.3d at 629. "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009).

To determine whether an expert's opinions are reliable, we examine the principles, research, and methodology underlying the expert's conclusions. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). "[E]ach material part of an expert's theory must be reliable." *Camacho*, 298 S.W.3d at 637. "If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) ("[I]f an

15

expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.").

Expert testimony may also be unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinions offered." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904–05 (Tex. 2004)). "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id.* Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached. *Id.*

Neither we nor the trial court decide if the expert's opinion is correct. *Id.* Rather, the critical issue is whether the analysis that is used to formulate those opinions is reliable. *Id.* "If an appraiser utilizes improper methodology or misapplies established rules and principles, the resulting testimony is unreliable and must be excluded." *Enbridge Pipelines*, 386 S.W.3d at 262; *see also Gharda*, 464 S.W.3d at 347–48 ("Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion." (quoting *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006))). "Reliability is an issue of admissibility for the trial court, not a weight-of-the-evidence issue for the factfinder." *Cent. Appraisal Dist. of Taylor Cty. v. W. AH 406, Ltd.*, 372 S.W.3d 672, 690 (Tex. App.— Eastland 2012, pet. denied).

KMPC first argues that the trial court erred when it granted the Appraisal District's motions to exclude because KMPC's experts were qualified and their opinions were both relevant and reliable. KMPC specifically asserts that the parties' dispute over the application of Section 23.175 was actually a factual dispute between

the experts over how much economic production remained in the SACROC, if that production would ever be realized, and the cost to obtain such production. *See LaSalle Pipeline LP v. Donnell Lands, L.P.*, 336 S.W.3d 306, 315 (Tex. App.—San Antonio 2010, pet. denied) ("[A]ll appraisal opinion is at best something of a speculation, and the question of market value is peculiarly one for the fact finding body." (citing *Tex. Pipe Line Co. v. Hunt*, 228 S.W.2d 151, 156 (Tex. 1950)); *see also Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 144 (Tex. 2016) ("When an expert's opinion is predicated on a particular set of facts, those facts need not be undisputed. An expert's opinion is only unreliable if it is contrary to actual, undisputed facts." (internal citations omitted)). KMPC further contends that the factual disputes between the experts went to the weight of their testimony, rather than its admissibility, and should have been a matter to be challenged through cross-examination. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998) (noting that, although the trial court has a threshold responsibility to ensure that an expert's opinion is both reliable and relevant, that "gatekeeping function under Rule 702 does not supplant cross-examination as 'the traditional and appropriate means of attacking shaky but admissible evidence'" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

In order to complain on appeal that the trial court erroneously excluded evidence, a party must (1) attempt to introduce that evidence during the evidentiary portion of the trial; (2) if the opposing party objects, specify the purpose for which the evidence is offered and supply reasons why the evidence is admissible; (3) obtain a ruling from the trial court; and (4) if the trial court excludes the evidence, make an offer of proof. *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 629–30 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "The arguments asserted at trial by the proponent of the evidence must comport with the arguments asserted on appeal." *In re C.Q.T.M.*, 25 S.W.3d 730, 738 (Tex. App.—Waco 2000, pet. denied); *see also*

17

*In re A.V.*, No. 11-16-00078-CV, 2017 WL 2484348, at *1 (Tex. App.—Eastland June 8, 2017, no pet.) (mem. op.).

Here, KMPC did not timely assert at trial that Little's and Hendrickson's testimony was admissible because the Appraisal District's objections to the testimony went to the weight and credibility, instead of the admissibility, of the evidence. Rather, KMPC argued that the construction of Section 23.175 was an issue of law for the trial court, moved for partial summary judgment on that issue, and sought to exclude the Appraisal District's experts on the basis that they, in formulating their opinions, had not complied with the dictates of Section 23.175. KMPC did not argue in response to the Appraisal District's motions to exclude Little and Hendrickson that the experts' differences of opinion on future production and costs were an issue of fact to be presented to the jury. KMPC also failed to raise this argument in its motion to reconsider the exclusion of its expert witnesses. Moreover, at trial, KMPC did not contend that Little's and Hendrickson's testimony was admissible because the factual differences in the experts' opinions affected the credibility and weight of their testimony, not its admissibility.

In its motion for new trial, KMPC finally asserted that Little's and Hendrickson's testimony was admissible because the factual disputes between the experts went to the weight and credibility, rather than the admissibility, of the evidence. However, "[w]hile a motion for new trial may preserve some errors, standing alone, it cannot preserve error related to the admission or exclusion of evidence." *Bank of Am., N.A. v. Ochuwa*, No. 01-19-00368-CV, 2020 WL 5269416, at *4 n.3 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.) (quoting *Jacob v. Jacob*, No. 01-16-00835-CV, 2018 WL 2141976, at *2 (Tex. App.—Houston [1st Dist.] May 10, 2018, no pet.) (mem. op.)); *see also* TEX. R. APP. P. 33.1(a); *Tidwell v. Terex Corp.*, No. 01-10-01119-CV, 2012 WL 3776027, at *14 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, no pet.) (mem. op.) (holding that

the appellant failed to preserve a theory of admissibility that was not raised in the trial court). KMPC, therefore, did not preserve for our review its complaint that the trial court improperly excluded Little's and Hendrickson's testimony because the differences between the experts' opinions went to the weight and credibility of the evidence, rather than to its admissibility. *See* TEX. R. APP. P. 33.1(a); *McKee v. McNeir*, 151 S.W.3d 268, 270 (Tex. App.—Amarillo 2004, no pet.) (holding that the proponent of evidence waived the complaint that the trial court erred in excluding the evidence because the proponent's stated grounds for admission at trial did not comport with the grounds raised on appeal).

KMPC proposes, however, that the trial court erred because it determined, based on its interpretation of Section 23.175, that KMPC's objections to the Appraisal District's experts went to the weight and credibility of the evidence while the Appraisal District's objections to KMPC's experts went to admissibility. Again, KMPC did not timely object to this alleged disparity in the trial court. *See* TEX. R. APP. P. 33.1(a). Regardless, even if KMPC had preserved this complaint, we do not agree that the record shows such a disparity.

The parties asserted numerous objections to the other's experts. For example, KMPC moved to exclude the Appraisal District's experts on the bases (1) that an appraisal report did not comply with the Uniform Standards of Professional Appraisal Practice, was too speculative, and was untimely and (2) that an expert was not a licensed appraiser; was not qualified by education or training; had contracted to prepare a report for informational purposes only; had relied on hearsay and did not track where he obtained his data; had failed to take into account, or improperly speculated about, the costs of plugging and abandoning wells; had improperly "double assessed" personal property used to produce the oil; and had failed to appraise the property actually owned by KMPC. KMPC also objected that all of the

Appraisal District's experts failed to comply with the dictates of Section 23.175 and improperly appraised the interest at market value.

The Appraisal District moved to exclude Little and Hendrickson on the ground that their opinions were not reliable and would not be helpful to the jury. The Appraisal District specifically argued that Little's and Hendrickson's primary and rebuttal testimony were based on an erroneous interpretation of Section 23.175 and had excluded significant contributors to the market value of the SACROC. The Appraisal District also moved to exclude Little's testimony on the grounds that he misunderstood the nature of KMPC's ownership in the oil and gas reserves and had erroneously deducted for plugging and abandonment costs. Finally, the Appraisal District moved to strike KMPC's experts based on KMPC's failure to timely disclose all documents that Hendrickson had reviewed in anticipation of his testimony and failure to adequately disclose the substance of the rebuttal testimony of KMPC's experts.

The trial court heard, on the same day, KMPC's motion for partial summary judgment and the parties' competing motions to exclude experts. KMPC argued that it was entitled to summary judgment because (1) by enacting Section 23.175, the legislature determined that an oil and gas interest was not to be appraised at market value, (2) it was impermissible to include in the appraisal future speculative production that could be obtained only through significant capital expenditures, and (3) taxation was not equal and uniform when an appraisal district had access to information about planned future development by a public company when such information was not available to appraise the mineral interests owned by individuals or other types of entities. The Appraisal District responded that (1) the Tax Code generally requires that all property be taxed at market value, (2) Section 23.175 controls only the projection of the future price of oil when the income method is

used to appraise property, and (3) Section 23.175 applies to oil and gas in place, not oil and gas in production.

Before it ruled on KMPC's motion for partial summary judgment, the trial court heard the competing motions to exclude. The Appraisal District argued in support of its motion that Little's and Hendrickson's primary and rebuttal opinions should be excluded because the opinions were based on a restrictive reading of Section 23.175 and that all the rebuttal experts should be excluded due to inadequate disclosure by KMPC. The Appraisal District also argued that Hendrickson, in formulating his opinions, used and considered only proved developed producing reserves because he was told to do so by KMPC, that he did not include all the property in his appraisal, and that his engineering conclusions were erroneous.

KMPC asserted that the Appraisal District's experts did not all rely on the same theory in formulating their opinions and that, if the trial court intended to exclude an expert on the basis that the expert relied on the incorrect legal theory, the Appraisal District should be required to disclose its theory. The Appraisal District responded:

> [T]he theory is 23.175. And we have affidavits that all of our experts' [sic] explain that. I understand that they criticize them, and this an issue for just credibility not admissibility. They say, "Oh, your decline curve is too steep or too shallow." That can go to weight. But when you patently exclude a significant portion of the subject property because of a misunderstanding of the law then you've got an issue of legal competency.

KMPC argued that it hated "to beat a dead horse but, again, what law? What is supposed to be included? All of the oil in place? Only the produced developed reserves? Only the undeveloped reserves that they have plans to? All the undeveloped reserves that anybody could -- where do we cut this off?"

KMPC then turned to its other objections to the Appraisal District's experts and argued that (1) Williamson testified at his deposition that he had not reviewed

21

the Texas Comptroller's manual when he prepared his appraisal, (2) Campbell and Hitt testified that they complied with Section 23.175 but "added on a little bit" of anticipated future projects, (3) Hornsby and Williamson failed to account for the double assessment of personal property that was necessary to produce oil from the SACROC, and (4) none of the Appraisal District's experts had valued KMPC's interest. The Appraisal District responded that, although its experts had differing valuation opinions, it was not permissible to assume a "fundamentally wrong legal position that constricts the statute, reads into it things that it doesn't say." The Appraisal District concluded that its "experts [were] in compliance and [KMPC's were] not."

The trial court first denied KMPC's motion for partial summary judgment. It then ruled:

> [KMPC's] Motions to Exclude [the Appraisal District's] Experts, those motions are denied. My take on those objections is that they go to the weight and the credibility, which goes to the weight and not to the admissibility. So those are denied.
>
> Because I'm going to make the determination at some point in time I might as well -- I need to express it on the record, so I express it now. I disagree with [KMPC's] theory of valuation. I agree with [the Appraisal District's] theory, and so I grant [the Appraisal District's] Motions to Exclude Little and Hendrickson. I grant in part but deny in part the Motion to Exclude the Rebuttal Witnesses. To the extent that a matter, an opinion, a thought -- a fact was expressed during the deposition and goes to rebuttal and not to theory of evaluation -- of valuation, not evaluation but valuation, then the motion is denied. To the extent it goes to the theory of valuation the motion is granted. And if it is an opinion being expressed that was not expressed during the depositions then the motion is granted.

The trial court did not rule on the Appraisal District's remaining objections to KMPC's expert witnesses. The trial court subsequently signed two orders in which it (1) excluded Little's and Hendrickson's testimony without stating a basis for its

ruling and (2) excluded any rebuttal testimony by KMPC's experts that was based on an improper construction of Section 23.175 or that had not been timely disclosed through discovery.

Based on the entire record of the motion hearing, after the trial court denied KMPC's motion for partial summary judgment, it considered KMPC's objections to the Appraisal District's experts that were not premised on an alleged incorrect interpretation of Section 23.175. The trial court ruled that those objections went to the weight and credibility, rather than the admissibility, of the experts' testimony. The trial court then immediately addressed both parties' objections based on the construction of Section 23.175, concluded that it agreed with the Appraisal District's theory, and granted the Appraisal District's motions to exclude KMPC's primary and rebuttal expert witnesses. The trial court's ruling was premised on both parties' position that the construction of Section 23.175 was a question of law that controlled the admissibility of the challenged opinions. Therefore, the trial court did not treat KMPC's challenges to the Appraisal District's experts based on an alleged improper construction of Section 23.175 differently than it treated the Appraisal District's challenges to KMPC's experts on that same basis.

Although KMPC has not challenged in this appeal whether the trial court's interpretation of Section 23.175 was correct,[3] we note that the trial court ruled only that it "agreed" with the Appraisal District's "theory." But the Appraisal District did not clearly set out its valuation theory either in its pleadings or through the opinions of its expert witnesses and did not expressly state what that "theory" might be. Rather, the Appraisal District argued only that, other than the restrictions that were placed on price by Section 23.175, the working interest should be appraised at "market value." However, all of the Appraisal District's experts acknowledged that

---

[3]Because no issue has been raised on appeal concerning the legal interpretation of Section 23.175, we express no opinion on its construction.

23

their appraisals were not true "market value" appraisals. Further, even though all the Appraisal District's experts assumed there would be continued investment into the SACROC by KMPC, they expressed differing opinions as to the categories of reserves and the amount of future production that could be included in the appraisal. For example, Hitt and Williamson valued the interest based only on proved developed production, Campbell valued the interest based on a mix of old developed reserves and new undeveloped reserves, and Hornsby valued the interest based on future production from all categories of reserves.

The most that we can discern from the trial court's agreement with the Appraisal District's "theory" is that KMPC's experts should have considered more in formulating their opinions than just proved developed production from existing wells and planned projects as of January 1, 2019. However, after Little and Hendrickson supplemented their opinions to include production from proved undeveloped reserves that were projected to be produced from projects that KMPC planned to complete as of January 1, 2019, the trial court excluded those supplemental opinions as well.

We are aware that KMPC has appealed the ARB orders for tax years 2020 and 2021 to the trial court in *Kinder Morgan Production Co. v. Scurry County Appraisal District*, Cause No. 26953, and has requested a declaration on a number of issues that are related to what production should be included in the appraisal of its interests in the SACROC. Should either the retrial of this cause on remand or the trial of the newly filed litigation over the appraisals for tax years 2020 and 2021 require that the trial court construe and interpret the meaning of Section 23.175, we urge the trial court to clearly express and delineate (1) its construction of Section 23.175; (2) whether that provision affects either the future production or the categories of reserves that are required to be included in the appraisal of an oil or gas interest for

24

purposes of ad valorem taxation; and (3) if so, what parameters, if any, it places on that production or those reserves.

For the reasons discussed above, we resolve KMPC's second issue against it.

D. *Supplementation of Expert Reports*

In its first issue, KMPC complains that the trial court abused its discretion through its "unexplained disparate treatment of the parties' experts" because it allowed the Appraisal District's experts to repeatedly supplement and revise their reports but denied KMPC's singular request that its experts also be allowed to supplement their report.

A party's duty to supplement written discovery regarding a testifying expert is governed by Rule 193.5 of the Texas Rules of Civil Procedure. TEX. R. CIV. P. 195.6. Pursuant to Rule 193.5, the duty to supplement or amend arises when a party learns that its previous responses to written discovery were incomplete or incorrect when made or are no longer complete or correct. TEX. R. CIV. P. 193.5(a). The responding party must amend or supplement its discovery responses to the extent that (1) the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses and (2) the written discovery sought other information, unless the additional or corrective information was made known to the other parties in writing, on the record at a deposition, or through other discovery responses. TEX. R. CIV. P. 193.5(a). Further, if an expert witness is retained by, employed by, or otherwise under the control of a party, the party must amend or supplement any deposition testimony or report by the expert with regard to the expert's mental impressions or opinions and the basis for them. TEX. R. CIV. P. 195.6.

An expert may refine his calculations or perfect his report through the time of trial without invoking the need to supplement. *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993); *see also Sw. Energy Prod. Co. v. Berry-*

25

*Helfand*, 491 S.W.3d 699, 717–18 (Tex. 2016). Further, an expert may modify his opinion testimony without supplementation if he is merely expanding on a subject that has already been disclosed. *Apollo Expl., LLC v. Apache Corp.*, 631 S.W.3d 502, 542 (Tex. App.—Eastland 2021, pet. filed); *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 581 (Tex. App.—Austin 2002, no pet.). "However, a party may not present a material alteration of an expert's opinion at trial that would constitute a surprise attack." *Bailey*, 92 S.W.3d at 581; *see also W. Tex. Gathering*, 868 S.W.2d at 305.

A party who fails to timely amend or supplement a discovery response pertaining to a testifying expert's opinions may not offer the expert's testimony unless the trial court finds that (1) there was good cause for the failure to timely provide the information or (2) the failure to provide the discovery will not unfairly surprise or prejudice the other party. TEX. R. CIV. P. 193.6(a), *amended by* Dec. 23, 2020 Tex. S. Ct. Order No. 20-9153 (effective January 1, 2021); *see also Apollo Expl.*, 631 S.W.3d at 542. The proponent of the evidence has the burden to establish a basis for allowing the introduction of the evidence. *See* TEX. R. CIV. P. 193.6(b); *F 1 Constr., Inc. v. Banz*, No. 05-19-00717-CV, 2021 WL 194109, at *2 (Tex. App.—Dallas Jan. 20, 2021, no pet.) (mem. op.).

The Appraisal District moved to exclude Little's and Hendrickson's testimony as not being helpful to the jury because it was "based on an improper legal concept" and was based on an "erroneous interpretation" of what future production and reserves should be considered in determining the economic life of the SACROC. The trial court excluded KMPC's experts on the ground that it disagreed with KMPC's "theory" of valuation and agreed with the Appraisal District's "theory." As discussed above, all that we can discern from the trial court's ruling is that, evidently as a matter of law, Little and Hendrickson, in formulating their opinions,

should have considered more than only future production from wells that were in existence or on which KMPC had commenced operations as of January 1, 2019.

In their supplemental report, Little and Hendrickson expanded the reserves that they considered to include proved undeveloped reserves that were projected to be produced as a result of projects that, as of January 1, 2019, KMPC planned to complete. However, on this record, we cannot say that these supplemental opinions necessarily complied with the trial court's ruling as to what future investment, production, and reserves should have been included under the Appraisal District's "theory" of valuation for an appraisal that is performed based on the income method subject to the price dictates of Section 23.175. Therefore, we cannot determine whether the supplemental opinions formulated by Little and Hendrickson were relevant for the jury to consider. *See Robinson*, 923 S.W.2d at 556 (holding that, to be relevant, an expert's opinions must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute). Because the record does not clearly demonstrate that these supplemental opinions would have assisted the jury in determining the value of the working interest based on the trial court's rulings and interpretation of Section 23.175, we cannot conclude that the trial court abused its discretion when it refused to allow Little and Hendrickson to testify about their supplemental opinions. *See Zwahr*, 88 S.W.3d at 629 ("Evidence that has no relationship to any issue in the case does not satisfy rule 702 and is thus inadmissible under rule 702."); *Camacho*, 298 S.W.3d at 637.

Further, KMPC has not asserted in this appeal that the amendments and revisions to the Appraisal District's experts' reports and opinions failed to comply with the trial court's interpretation of Section 23.175. Therefore, we cannot conclude that the trial court treated the parties disparately if the revised and amended opinions of the Appraisal District's experts complied with the trial court's rulings

27

and construction of Section 23.175, but the supplemental opinions proffered by KMPC's experts did not.

Accordingly, we resolve KMPC's first issue against it.

IV. *Motion for Continuance*

In its third issue, KMPC argues that the trial court abused its discretion when it denied KMPC's written motion and subsequent oral requests to continue the August 2020 trial after (1) KMPC's lead counsel had been instructed by his personal physician not to appear at trial in person and (2) various technical difficulties that occurred during the trial prevented its lead counsel, who only participated by remote means, from effectively representing KMPC.

On April 14, 2020, KMPC filed a motion for continuance based on difficulties caused by the COVID-19 pandemic. KMPC specifically argued that (1) the discovery deadline was April 22, 2020; (2) it had noticed all necessary depositions for dates prior to the trial court's discovery deadline but the Appraisal District had objected to the specified time of day and location; (3) the Appraisal District had indicated that it wanted to depose KMPC's witnesses but had not noticed those depositions to occur prior to the discovery deadline; (4) due to the length and complexity of the anticipated depositions, they were not suitable to be taken by electronic means; and (5) because of his age and underlying medical conditions, KMPC's lead counsel had been advised by his personal physician to remain in self-isolation for six weeks, not to travel, and not to be within six feet of other individuals. On April 17, 2020, the trial court denied KMPC's motion for continuance.

KMPC filed a motion for reconsideration on May 28, 2020 on the ground that, on May 26, 2020, in its Seventeenth Emergency Order Regarding the COVID-19 State of Disaster, the Texas Supreme Court had ordered that a trial court could not proceed with a jury trial prior to August 1, 2020, unless, among other requirements, all parties to the case consented to the jury trial setting. KMPC advised the trial

28

court that it would not consent to commencing a jury trial prior to August 1, 2020. Although expressing disagreement with the supreme court's order, the trial court nonetheless granted the motion for reconsideration but then reset the voir dire for August 20, 2020, with the trial on the merits to commence on August 24, 2020.

KMPC filed a second motion for continuance on August 6, 2020. KMPC argued that, even though the COVID-19 pandemic had required many changes in all aspects of society, it had not changed a litigant's "right of Constitutional proportions to be aptly represented by counsel of their choice." KMPC asserted that the denial of this due process right would constitute fundamental error. Factually, KMPC asserted that, on the advice of his personal physician, KMPC's lead counsel could not attend the trial in person as it was currently set; that KMPC was not responsible for its lead counsel's absence; and that delaying the trial would not prejudice the Appraisal District. On August 13, 2020, the trial court denied KMPC's second motion for continuance. KMPC thereafter unsuccessfully sought mandamus relief from both this court and the Texas Supreme Court.[4]

The voir dire and trial of the case were held in the local high school auditorium to allow for social distancing between the participants. The trial court's denial of KMPC's second motion for continuance, and the effect of its ruling, necessitated that the appearance and participation of KMPC's lead counsel at trial, if at all, be accomplished remotely through Zoom (lead counsel's physical appearance was to be depicted on a large video screen that had been assembled in the high school auditorium) while his two co-counsel and the Appraisal District's lead counsel and

---

[4]*See In re Kinder Morgan Prod. Co., LLC*, No. 20-0634, *available at* https://search.txcourts.gov/Case.aspx?cn=20-0634&coa=cossup; *In re Kinder Morgan Prod. Co., LLC*, No. 11-20-00190-CV, *available at* https://search.txcourts.gov/Case.aspx?cn=11-20-00190-CV&coa=coa11.

co-counsel were able to appear and participate in person.[5] KMPC hired individuals with technical expertise to assist the technology department at the high school and lead counsel in his office in Dallas with the logistics of remote participation. Before voir dire commenced, KMPC orally objected to being required to proceed to trial without the in-person presence of its designated lead counsel and re-urged its motion for continuance. The trial court, again, denied the motion.

There were significant technical difficulties that occurred during voir dire that prevented KMPC's lead counsel from fully and effectively participating in that phase of the trial. By our count, there were (1) three occasions that feedback issues were noted, (2) twenty-eight instances when a participant had difficulty hearing another participant, (3) four times that KMPC's lead counsel could not see at least some portion of the venire panel, and (4) thirteen times that KMPC's lead counsel requested that one of his co-counsel assume the questioning of the venire or responding to asserted objections.

The following morning KMPC again renewed its motion for continuance and also orally requested a mistrial based on the numerous technical difficulties that had occurred during voir dire. During the hearing on KMPC's oral motion, which was argued by co-counsel, KMPC's lead counsel, who was still appearing and participating via Zoom, (1) stated four times that he could not hear what was being said by counsel and the trial court and (2) noted that the trial court was "reverberating pretty bad." His co-counsel stated that there had already been technical issues with the Zoom stream that morning and that it could only be expected that these issues would continue. Co-counsel argued that KMPC was entitled to a fair trial and that the ongoing technical difficulties had compromised its ability to receive one.

_____

[5]Although not relevant to our analysis, we note that both of KMPC's co-counsel averred that they did not have the experience to act as first-chair trial counsel in a case of this magnitude and complexity.

In response to KMPC's arguments and requests, the trial court stated that the trial had been approved by the Office of Court Administration (OCA), that KMPC's petitions for writ of mandamus had been denied, and that the trial was being held in "a fabulous facility that allows us to do what is envisioned by the Supreme Court." The trial court further stated that "[w]e are not shutting down the judicial system in Texas because of technology issues that we have dealt with, addressed, and largely overcome." The trial court then denied both the motion for continuance and the motion for mistrial.

However, and unfortunately, the technical difficulties continued. Prior to lead counsel's direct examination of KMPC's first witness, the trial court noted that there were "too many mics open at once." During the witness's direct examination, there were two complaints about feedback; nineteen complaints that a participant could either not hear or not understand what was being said; three complaints that KMPC's lead counsel could not see the exhibits that were offered, the witness, or the judge; and three requests by KMPC's lead counsel that his co-counsel needed to assume the responsibility for responding to objections. KMPC's lead counsel ultimately objected and stated that, due to the multitude of technical difficulties, he was not able to "fulfill [his] duties." The trial court overruled the objection but granted permission for co-counsel to question the witness on re-direct. After the first day of trial had concluded, and despite the rash of technical difficulties that had occurred since the commencement of voir dire, the trial court stated that KMPC's lead counsel could continue to participate in the trial by using a method other than Zoom, but that it was "not shutting down the judicial system" and was "not shutting down this case." Throughout the second day of trial, KMPC's lead counsel did not conduct the examination of any witness.

KMPC's offer of proof concerning the testimony of Steve Hendrickson was conducted in the courtroom of the 132nd district court, rather than the high school

31

auditorium. At the beginning of the offer of proof, the trial court noted that there had been audio problems "that could not be overcome -- or were not overcome by the technical staff provided by [KMPC]."[6] However, according to the trial court, the trial was "an experiment being watched" by OCA "to assist them in their recommendations to the Supreme Court, both positives and negatives, about how a proceeding might be conducted to furnish social distancing and safety and health for all the participants."

KMPC's lead counsel requested that the trial court note in its report to OCA that, on the first day of trial, in addition to the other disruptions and difficulties we have outlined in this opinion, he had lost his internet connection for thirty or forty minutes. KMPC's lead counsel readily conceded that the internet problem was "on his end." The trial court responded that its staff noticed that KMPC's lead counsel had lost the internet connection and had immediately messaged the trial court about the problem and had begun efforts to reconnect KMPC's lead counsel by Zoom. The trial court's staff was ultimately successful at restoring the connection, but it took "a little bit of time." The record does not show that the trial court recessed the trial during the period of time that lead counsel was not able to be present or participate through Zoom because of complications with the internet connection.

A trial court may not grant a continuance "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Further:

> Except as provided elsewhere in these rules, absence of counsel will not be good cause for a continuance or postponement of the cause when called for trial, except it be allowed in the discretion of the court,

---

[6]We are aware of no authority, and none has been cited by the parties, that KMPC was required to provide a technical staff for the trial or that the technical staff provided by KMPC had the burden to overcome the numerous audio problems that occurred in the venue that was selected by the trial court.

upon cause shown or upon matters within the knowledge or information of the judge to be stated on the record.

TEX. R. CIV. P. 253.

At oral argument, the Appraisal District asserted that KMPC failed to preserve its complaint concerning the trial court's refusal to continue the trial because it did not file a written motion for continuance based on the numerous technical difficulties that were encountered during the trial. An oral motion for continuance generally does not preserve error. *In re Marriage of Harrison*, 557 S.W.3d 99, 118 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Further, when a movant fails to comply with Rule 251's requirement that a motion for continuance be supported by affidavit, we generally presume that the trial court did not abuse its discretion when it denied the motion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *In re A.R.*, No. 11-20-00152-CV, 2020 WL 7258023, at *4 (Tex. App.—Eastland Dec. 10, 2020, pet. denied) (mem. op.). However, this presumption "does not equate to a foregone conclusion that the trial court did not abuse its discretion by denying a motion for continuance when the movant fails to comply with Rule 251." *In re E.R.G.*, No. 11-20-00248-CV, 2021 WL 1807332, at *1 (Tex. App.—Eastland May 6, 2021, no pet.) (mem. op.).

In this case, KMPC's objections and oral motions for continuance during trial were premised on the same basis as the written motion that it had filed before trial commenced—that KMPC had a right to be represented by its counsel of choice and that its retained lead counsel could not attend the trial in person during the COVID-19 pandemic based on lead counsel's health concerns and the instructions that he had received from his personal physician. Further, the extent of the technical difficulties that occurred during the trial proceedings and that were noted and known to all involved, including the trial court, could not have been foreseen by KMPC before the proceedings commenced. Under these circumstances, we conclude that

33

KMPC preserved this complaint for our review. *See MWM Helotes Ranch, Ltd. v. White*, No. 04-18-00498-CV, 2020 WL 1695510, at *8 (Tex. App.—San Antonio Apr. 8, 2020, no pet.) (mem. op.) (recognizing that, when an emergency leaves a party without legal representation due to no fault by the party, the absence of an affidavit is not dispositive); *Rehabilitation Facility at Austin, Inc. v. Cooper*, 962 S.W.2d 151, 155 (Tex. App.—Austin 1998, no pet.) (considering on appeal a written motion for continuance that was orally re-urged on the day of trial).

"[T]he right to be represented by counsel of choice is a valuable one and the unwarranted denial of that right has been held to be fundamental error." *In re Vossdale Townhouse Ass'n, Inc.*, 302 S.W.3d 890, 893 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding); *see also Moss v. Malone*, 880 S.W.2d 45, 50 (Tex. App.—Tyler 1994, writ denied) (holding that an unwarranted denial of a party's right to be represented by counsel of its choice is fundamental error where the party, without negligence or fault on its part, is deprived of the right of counsel on the eve of trial); *Swartz v. Swartz*, 76 S.W.2d 1071, 1072 (Tex. App.—Dallas 1934, no writ) ("[A party's] right to appear and be represented, by counsel of his own choosing, is valuable, and its unwarranted denial is reversible error."). Although a party's right to counsel of its choice is not absolute, a trial court should not deprive a litigant of that right absent a compelling reason. *In re El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 146, 152 (Tex. App.—El Paso 2005, orig. proceeding); *Keller Indus., Inc. v. Blanton*, 804 S.W.2d 182, 185 (Tex. App.—Houston [14th Dist.] 1991, orig. proceeding). As such, the unwarranted denial of a party's choice of counsel is an abuse of discretion by the trial court. *In re Vossdale*, 302 S.W.3d at 895. However, a trial court does not abuse its discretion when it denies a motion for continuance based on the absence of lead counsel if the complaining party was adequately represented by another attorney associated with the case. *R.M. Dudley Constr.,*

*Inc. v. Dawson*, 258 S.W.3d 694, 701–02 (Tex. App.—Waco 2008, pet. denied); *Cooper*, 962 S.W.2d at 155–56.

Here, KMPC's lead counsel was not completely absent from trial. Indeed, KMPC's lead counsel appeared and attempted to participate at trial, albeit remotely through Zoom, and KMPC had other counsel who were familiar with the case that were present in person during the trial to represent its interests. However, to say, based on these unique facts and circumstances, that the trial court did not abuse its discretion when it denied KMPC's requests for a continuance would be tantamount to ignoring what actually occurred during the trial. *See Joe*, 145 S.W.3d at 161 (holding that whether a trial court abused its discretion when it denied a motion for continuance is considered on a case-by-case basis). For instance, the record clearly shows that KMPC's lead counsel, who was specifically retained based on his expertise in this area of law, was only present and able to participate at the trial via a video screen and Zoom stream that repeatedly malfunctioned. Furthermore, a myriad of problems were encountered with the functionality of the audio system in the auditorium during the trial. These technical difficulties and failures were beyond KMPC's control and prevented its lead counsel from accomplishing what he had been hired and expected to do—to effectively participate and represent his client's interests at trial.

The Appraisal District asserts that KMPC was not entitled to a continuance because its failure to be represented by its counsel of choice at trial was due to its own fault or negligence. The Appraisal District specifically asserts that KMPC (1) knew in March 2020 that its lead counsel's health concerns could impact his ability to appear in person at trial, (2) had sufficient time to obtain new counsel prior to trial, and (3) took no steps to obtain new counsel. Generally, a party who requests a continuance based on the absence of counsel must show that the absence of counsel was not the result of the party's "own fault or negligence." *Sims v. Sims*, 623 S.W.3d

35

47, 59 (Tex. App.—El Paso 2021, pet. denied) (quoting *Villegas*, 711 S.W.2d at 626). We question, however, whether KMPC, when faced with the enormous uncertainties created by and associated with a pandemic caused by a new and potentially life-threatening virus, exhibited "fault or negligence" when it decided not to jettison its lead counsel during the very limited and compressed timeframe that the trial court imposed and allocated for the parties to prepare this case for trial.

We recognize that the trial court and the parties attempted to establish a system through which KMPC's lead counsel could participate remotely in the trial. *See In re Rodriguez*, No. 05-20-00523-CV, 2020 WL 2487061, at *2 (Tex. App.— Dallas May 13, 2020, orig. proceeding) (mem. op.) (agreeing with the relator that "the unique and serious circumstances created by the COVID-19 pandemic require flexibility and adaptability in all aspects of our legal system."). Nevertheless, that system, and the attempts to utilize it, simply did not work here. Even on a dry record, the voir dire, which is a critical phase of any trial, was clearly disjointed and lead counsel's ability and attempts to communicate with and establish a rapport with the venire was significantly compromised. During the hearing on KMPC's oral motion for continuance, the trial court noted that the technical issues had been resolved. Contrary to this assertion, the record shows that those difficulties persisted, that KMPC's lead counsel lost his internet connection for a period of time as the trial continued to proceed in his absence and without his ability to participate, and that lead counsel was unable to consistently and effectively question witnesses or respond to objections. *See Stefanov v. Ceips*, 395 S.W.2d 663, 665 (Tex. App.— Amarillo 1965, no writ) (holding that, because the appellant had a valuable right to be represented by counsel of his own choosing and was denied that right through no fault or negligence on his part, the trial court reversibly erred when it failed to continue the case until such time as the appellant could have been represented by counsel of his own choice). Based on lead counsel's inability to fully and effectively

36

participate in the trial, and the unique circumstances presented, we hold that KMPC was deprived of its fundamental right to representation by counsel of its choice.

Further, we note that the trial court, even after observing the ongoing technical difficulties that we have identified in this opinion, determined that a continuance was not warranted. The trial court's stated reasons, *inter alia*, for denying KMPC's requests for a continuance were because (1) the trial was "an experiment" to assist the OCA in reporting positive and negative aspects of conducting a jury trial during the pandemic and (2) the trial court had determined that it would not "shut[] down the judicial system" despite KMPC's complaints. Irrespective of what the trial court intended to achieve, it failed to recognize that by not adjourning the trial, at least until the technical difficulties could be resolved entirely, it was effectively forcing KMPC to be a participant in a failed experiment and was "shutting down" the justice system as far as KMPC was concerned. Here, the compounded problems that occurred throughout the trial resulted in a situation that became unmanageable, and the trial court's insistence and desire to proceed with and complete this "experiment" for the purpose of providing statistical "jury trial" data to the OCA significantly overshadowed KMPC's fundamental right to due process and representation by counsel of its choice. In this instance, we cannot say that the trial court's intentions justified its actions. Consequently, on this record, we hold that the trial court abused its discretion when it denied KMPC's requested continuance.

The Appraisal District argues that, even if the trial court erred when it denied the requested continuance, there was no harm to KMPC because KMPC's experts on valuation had been excluded, KMPC could not produce any evidence that would have precluded the grant of a directed verdict in favor of the Appraisal District, and lead counsel's participation, or lack thereof, during the trial could not have impacted the trial's outcome. However, a party's right to be represented by counsel of its own choosing is a "significant one," *In re Vossdale*, 302 S.W.3d at 892, and depriving a

party of its counsel of choice "can result in immediate and palpable harm," *id.* at 895 (quoting *Keller Indus., Inc. v. Blanton*, 804 S.W.2d 182,185 (Tex. App.—Houston [14th Dist.] 1991, orig. proceeding)); *see also In re Nitla*, 92 S.W.3d at 423 (noting that disqualification of an attorney "is a severe measure that can result in immediate harm, because it deprives a party of its chosen counsel and can disrupt court proceedings); *Caddell v. Caddell*, 597 S.W.3d 10, 15 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (holding that the appellant met her burden of showing that she was harmed by being put to trial without her counsel because she established that she went to trial unrepresented and unprepared and suffered an adverse judgment).

In light of our discussion, we do not hold that a party is entitled to a continuance as a matter of right when its counsel of choice is unable to appear in person at trial or that a party is always harmed when its lead counsel is required to appear and participate in a trial remotely. As we have said, the circumstances before us are quite unique to say the least. However, the trial court imposed a very aggressive and stringent discovery and trial schedule in an extremely complicated case where the amount in controversy was substantial. A lawyer who was retained specifically for his expertise in the area of law that was relevant to this case was unable to attend or participate in the trial in person during a novel and unforeseen pandemic because, due to his underlying health conditions, his personal physician had advised him not to do so. We should not fault or punish lead counsel, or his client (KMPC), because of legitimate concerns that may adversely affect one's health and well-being. Neither should the trial court.

After the trial court ruled that the trial of this case would proceed with KMPC's lead counsel appearing and participating remotely, the trial court and the parties took steps to ensure that lead counsel's remote representation and participation in the trial could be effective. In fact, KMPC hired professionals to be present at trial and in lead counsel's office to assist with any technological issues.

Despite the best efforts of everyone involved, due to the reoccurring technical difficulties that were not attributable to KMPC, KMPC's lead counsel could neither hear nor view the trial proceedings on a consistent basis and actually lost the internet connection to the trial for a period of time as the trial proceeded in his absence. In the end, his ability to fully and effectively represent KMPC was significantly diluted. Although KMPC timely brought to the trial court's attention that its lead counsel was unable to "fulfill his duties" under the existing circumstances, the trial court refused to continue the trial and ultimately directed a verdict against KMPC.

The overarching purpose of the remote proceeding protocol is to accommodate, rather than hinder, a party's ability to effectively participate in a court proceeding. When the protocol and its purpose fail, prudence suggests that the court proceeding that is attempting to utilize it should either adjourn or be postponed. Here, the protocol failed and its intended purpose was hindered. As such, based on the unique circumstances before us, we hold that the trial court's unwarranted denial of KMPC's right to be represented by its chosen counsel constituted reversible error.

Accordingly, we sustain KMPC's third issue.

## V. *This Court's Ruling*

We reverse the trial court's judgment and remand this cause in its entirety to the trial court for further proceedings consistent with this opinion. In doing so, we note that "[w]hen an appellate court remands a cause, the effect is to remand the cause for a new trial on all the issues of fact, and the case is reopened in its entirety." *Graham Sav. & Loan Ass'n, F.A. v. Blair*, 986 S.W.2d 727, 729 (Tex. App.—Eastland 1999, no pet.); *see also Eagle Supply & Mfg. L.P. v. Landmark Am. Ins. Co.*, 630 S.W.3d 342 (Tex. App.—Eastland 2021, pet. filed) ("Generally, when an appellate court reverses and remands a case for further proceedings, and the mandate is not limited by special instructions, the effect is to remand the case to the lower court on all issues of fact, and the case is reopened in its entirety." (quoting *Simulis,*

*L.L.C. v. Gen. Elec. Capital Corp.*, 392 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.,] 2011, pet. denied)); *Reynolds v. Murphy*, 266 S.W.3d 141, 148–49 (Tex. App.—Fort Worth 2008, pet. denied) (holding that the trial court erred when, following a general remand, it (1) struck the appellants amended pleadings asserting new causes of action and (2) froze discovery).

W. STACY TROTTER

JUSTICE

December 30, 2021

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.